## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 29 2016, 9:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Gary, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: J.W.P. and S.P., (Minor Children), <br><br> and <br><br> J.W. (Father), <br> *Appellant-Respondent*, <br><br> v. <br><br> The Indiana Department of Child Services, <br><br> *Appellee-Petitioner*. | July 29, 2016 <br><br> Court of Appeals Case No. 45A04-1602-JT-365 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Thomas P. Stefaniak, Jr., Judge <br><br> Trial Court Cause Nos. 45D06-1411-JT-263 45D06-1411-JT-264 |

**Brown, Judge.**

J.W. ("Father") appeals the involuntary termination of his parental rights with respect to his children, J.W.P. and S.P. (the "Children"). Father raises one issue which we revise and restate as whether the evidence is sufficient to support the termination of his parental rights. We affirm.

*Facts and Procedural History*

Father and M.P. ("Mother") are the biological parents of J.W.P., born March 27, 2008, and S.P., born May 19, 2009.[1] The Children were one and two years of age when Father was incarcerated for crimes of "theft or burglary." Transcript at 37. On April 8, 2013, the Department of Child Services ("DCS") received a report that Mother was using marijuana, cocaine, and heroin while caring for the Children and that Father was incarcerated in the Miami Correctional Facility. When requested by DCS, Mother refused to take drug screens but admitted that she smoked marijuana. DCS did not remove the Children at that time, and Mother agreed to participate in services.

On April 23, 2013, DCS filed a petition alleging that the Children were children in need of services ("CHINS") on the basis of unsanitary home conditions, Mother's continued drug use, and Father's incarceration and inability to care for the Children. On the same day, the court held an initial hearing, adjudicated the Children as CHINS based upon Mother's admission to the material allegations in the CHINS petition, and left the Children in Mother's

___

[1] Mother voluntarily relinquished her parental rights to the Children at the outset of the termination hearing, and thus we state the facts relevant to Father's appeal.

custody. Father, who remained incarcerated, did not appear at the initial hearing, and the court found there was inadequate service of process on him and ordered him to establish paternity as to S.P. On April 26, 2013, the Children were removed from Mother's care when Mother's drug screens yielded positive results for THC, opiates, methadone, and cocaine.

[4] On May 20, 2013, the court held a dispositional hearing, granted wardship of the Children to DCS, and ordered Mother to participate in reunification services. On November 15, 2013, the court held an initial CHINS hearing as to Father, who remained incarcerated, and again determined that the Children were CHINS. The court also "reiterate[d] all orders and findings [as to] . . . [Father], father of [S.P.] and [J.W.P.]" previously entered in the case retroactive to April 26, 2013.[2] Appellant's Appendix at 10; DCS Exhibit L. Due to his incarceration, DCS did not attempt to provide Father with services, and, on August 11, 2014, the court conducted a review hearing, at which it changed the Children's permanency plan from reunification with Mother to adoption and termination of parental rights.

[5] On November 20, 2014, DCS filed for termination of Father's parent-child relationship. On November 4, 2015, the court held an evidentiary hearing on

---

[2] An initial CHINS hearing as to Father was initially scheduled for July 24, 2013 but was continued due to inadequate service of process on Father.

the termination petitions. Father was incarcerated at the time of the hearing but testified telephonically and was represented by counsel at the hearing.

[6] Father, who was thirty-four years old at the time of the hearing, testified that since 2011 he has been incarcerated and has voluntarily participated in various prison programs, including earning his GED and participating in Inside/Out Dad, the Almond Tree substance abuse program to celebrate recovery, and the Cliff and Grit therapeutic inpatient recovery program. He also received a certification in "Building Emergency, Hazmats, Ergonomics, and blood born pathogens." *Id.* at 25. He was initially sentenced to two consecutive nineteen and one-half year sentences and had previously petitioned the court for a sentence modification, which was granted. Father stated that he received a purposeful incarceration order and his sentences were ordered to be served concurrently. He added that he could not speculate if the court would further modify his sentence, that he did not intend to serve the remaining three years and nine months, and that he would be out before then because everything he had done since his incarceration "has been so I could leave here sooner as opposed to later, to in fact come home and be a father to my kids." *Id.* at 26. Father stated that his contact with the Children since his incarceration has been "sporadic," and occurred "during the times they were out at their scheduled visitation," in which he "would be able to speak to them through the phone." *Id.* at 28.

[7] On cross-examination, Father acknowledged that, in addition to having one of his consecutive sentences be made concurrent, he had also received "two six

month time cuts from the Department of Correction[]" for his participation in services offered by the correctional facility, but that he participated in those services "for the help [he] was seeking" and that the time cuts to his sentence were "secondary" in importance. *Id.* at 34-35. He stated that he has struggled with addiction to opiates "off and on," since he was fifteen years old. *Id.* at 41. He testified that his criminal history began as a juvenile and has continued into his adulthood, that his "felonies have centered around [his] drug use," were "all primarily theft charges," that he is currently incarcerated on charges of "theft or burglary," and that his other felonies have included prescription fraud and forgery. *Id.* at 37. Father acknowledged that his earliest release date is July 24, 2019, and that following his release he plans to be employed, to "touch base with [his] children," and to live with his mother "until [he] get[s] enough money to step out on [his] own." *Id.* at 39-40. He also stated that prior to his current incarceration, he was struggling with his drug addiction and living in a hotel that he paid for by the month where he "had visitation with [the Children] . . . two, maybe sometimes three days out of the week." *Id.* at 41. In response to whether he had financially provided for the Children, Father testified that he had done so "periodically, never at a steady, steady, pace, never consistently" but that prior to being incarcerated he had "always had a job at one time or another." *Id.* at 43. He explained that, despite his gainful employment, he engaged in criminal activity because "the cost for [his] drug habit exceeded the balance of what it was that I was making and earning," and he acknowledged that the Children were conceived at a time when he was abusing drugs. *Id.* at 43. He also stated that his brother sometimes lives at his mother's house, and

he acknowledged that his brother is a convicted felon with a history of drug abuse.

[8]     Jessica Garza, ("FCM Garza") testified that she had been the Children's case manager since April 2013, had visited them twice per month for the last two years, and was very familiar with the Children. She stated that the Children were living with their maternal great aunt and uncle, they are "very well cared for," and, although S.P. had to repeat kindergarten, the Children are "socially involved with sports, community." *Id.* at 54. Regarding the Children's relationship with Father, FCM Garza stated that the Children "have never talked to me about [Father] or questioned me about his whereabouts or stated that they missed him or nothing of that nature," and she added that although the Children know who their Father is and that he is in jail, "as far as a relationship that was preexisting prior to the involvement, no." *Id.* at 55. She stated that she did not believe that the condition that led to removal, unavailability due to incarceration, was likely to be remedied because Father "has been struggling with drug abuse since prior to his adulthood," and had accumulated an extensive criminal history largely related to his drug habit. *Id.* at 60.

[9]     When asked whether it was in the Children's best interest to terminate Father's parental rights, FCM Garza responded affirmatively and noted the following concerns:

> Well, the concern for recidivism . . . . Temptation with drug abuse, with such an extensive history, the ability to provide some

stability with now having been incarcerated and charged, would be likely very difficult for him to find decent and stable employment upon his release. So, financial stability would also be a concern.

*Id.* at 57. FCM Garza also opined that "[a]t this point, [the Children] don't necessar[ily] have a relationship" with Father. *Id.* at 61. She added that she did not believe that it would be in the Children's best interest to delay permanency until Father's release. In light of Father's pattern of drug use, she also expressed a concern related to the possibility of Father living with the Children in his mother's home along with his brother who also potentially suffers from a drug addiction.

[10] On November 12, 2015, the court entered an order terminating Father's parental rights. Specifically, the order states in part:

> There is a reasonable probability that the conditions resulting in the removal of the [Children] from their parents' home will not be remedied in that: The children were removed from parental care April of 2013 due to [Mother's] drug usage and [Mother] failing to properly supervise her [Children]. Father was incarcerated at the time of the initial referral.
>
> * * * * *
>
> Father is currently incarcerated and has been for the last five years. Father's expected release date is 2019. Father has not participated in the case plan due to his incarceration. Father is unavailable to participate or to care for [the Children]. Father has been bettering himself while incarcerated by participating in prison programs.

Father has not been a part of [the Children's] lives due to his incarcerations. The [Children] were one and two years of age when [Father] was incarcerated for his present sentence, the [Children] are now six and seven years of age. [Father] has not significantly participated in [the Children's] lives. Father has never financially supported [the Children]. Father does not and has not provided any emotional support for [the Children].

Father . . . testified telephonically that he had a long history of substance abuse, Father testified that he was incarcerated in 2006 for 18 months for prescription fraud. Father testified that he has another child that is [in] relative care. When [Father] was released from prison he testified that he continued to use drugs. Father further testified that he has approximately eight felony convictions and 6 misdemeanor convictions stemming back from the year 2000. Father's criminal history includes thefts, burglaries, and drug charges among other offenses. Father testified that he has had criminal problems for the past fifteen years. Father has been incarcerated on a number of occasions and continues with his pattern of conduct when released from incarceration. The pattern of conduct over the past fifteen years indicates that there is a strong likelihood that the pattern would continue when [Father] is released from incarceration. Father testified he is now drug free and needed to be imprisoned to help him. Even if [Father] remains drug free after release from prison he is unavailable to parent for at least three more years.

No parent is providing any emotional or financial support for [the Children]. [Father] is incarcerated and will continue with his incarceration for a number of years. Father is unavailable to parent his [Children] and will continue to be unavailable for a number of years. The [Children] have been in placement since April of 2013 and have not been returned to parental care or custody. The [Children] are in relative placement and multiple relatives are interested in adopting [the Children].

There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the [Children] in that: for the reasons stated above. Additionally, the [Children] deserve a loving, caring, safe, stable and drug free home. The lack of permanency and lack of security would be detrimental to [the Children]. Father testified that upon release he will live with his mother until he can get on his feet and his drug addicted brother also currently lives in that home.

It is in the best interest of the [Children] and their health, welfare and future that the parent-child relationship between the [Children] and their parents be forever fully and absolutely terminated.

The Indiana Department of Child Services has a satisfactory plan for the care and treatment of the [Children] which is Adoption.

Appellant's Appendix at 1-3.

## *Discussion*

The issue is whether the evidence is sufficient to support the termination of Father's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[12] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.,* 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied.* This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592

N.E.2d 1232, 1235 (Ind. 1992)). "We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment." *Id.*

[13] "Reviewing whether the evidence 'clearly and convincingly' supports the findings, or the findings 'clearly and convincingly' support the judgment, is not a license to reweigh the evidence." *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967), *reh'g denied*)). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id.* at 640.

### *Remedy of Conditions*[3]

[14] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[15] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *In re E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not

---

[3] Father does not challenge the court's conclusions regarding Ind. Code § 31-35-2-4(b)(2)(A) and -4(b)(2)(D), and thus we confine our discussion to Sections 4(b)(2)(B) and 4(b)(2)(C).

preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id.*

[16]     In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *Id.* (citation and internal quotation marks omitted). A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re Z.C.*, 13 N.E.3d 464, 469 (Ind. Ct. App. 2014), *trans. denied*.

[17] Father argues that the court's ruling in support of termination was clearly erroneous, and that despite his incarceration, over the duration of the CHINS cases he participated in substance abuse and parenting and employment certification programs. He asserts that the court gave "no weight to his participation" in prison programs, that it "failed to consider [Father's] relationship with his [Children], before his incarceration," and that "he has changed his life and will be able to be a stable parent for his [Children], upon his release from prison." Appellant's Brief at 9.

[18] DCS maintains that the unchallenged findings support the court's judgment. It also points to the evidence which supports the findings that Father appears to challenge, and maintains that the court's conclusion that there is a reasonable probability that Father is unlikely to remedy the conditions leading to removal is not clearly erroneous.

[19] DCS is not required to offer a parent services aimed at reunification with the child when the parent is incarcerated. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 377 (Ind. Ct. App. 2006), *trans. denied*. We have previously noted that "'[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children.'" *K.T.K.*, 989 N.E.2d at 1235-1236 (quoting *In re A.C.B.*, 598 N.E.2d 570, 572 (Ind. Ct. App. 1992)). A parent's incarceration is an insufficient basis for termination, and we have "not established a bright-line rule for when release [from incarceration] must occur to maintain parental rights." *K.E. v. Indiana Dep't of Child Servs.*, 39 N.E.3d 641, 643, 648 (Ind. 2015)

[20] The record reveals that at the time of the hearing J.W.P., who was seven years old, and S.P., who was six years old, have had a limited relationship with their Father both prior to his incarceration and since he has been incarcerated. Father has been incarcerated since 2011 and has remained so for the entirety of both the CHINS and termination proceedings. Father testified that his earliest release date is July 24, 2019, nearly three and one-half years after the termination hearing. The Children were born prior to Father's most recent term of incarceration, and since he has been incarcerated his contact with the Children has been "sporadic." Transcript at 27. No evidence was presented that Father regularly wrote letters or spoke to the Children on the phone. FCM Garza reported the Children never spoke of Father. Regarding Father's pattern of criminal conduct, the record reflects that his adult criminal history dates back to 2000 and, including his current incarceration, totals eight felony convictions and six misdemeanor convictions. Father has struggled with addiction to opiates "off and on" since he was fifteen years old. *Id.* at 41. We acknowledge, as the trial court did, that Father testified he had participated in a variety of programs to aid him in becoming a better parent, including substance abuse and parenting programs, but the trial court chose not to give significant weight to Father's testimony on the positive steps he has taken to improve himself while incarcerated.

[21] Regarding his post-incarceration plans, Father stated that he intended to "touch base" with the Children, that he planned to live with his mother until he earned "enough money to step out on [his] own," but he acknowledged that his

brother, who is a convicted felon with a history of drug use, also sometimes stayed at his mother's house. *Id.* at 39. He added that he had worked in "asphalt and sealing coating or tree service," that prior to his current term of incarceration he had his "own residential lawn service," and that upon his release he would "take the job that is available to me from past employers that will undoubtedly hire me back." *Id.* at 40-41. Despite his work history, Father also acknowledged that he had "periodically, never at a steady, steady, pace, never consistently" provided financially for the Children. *Id.* at 43.

[22] Given Father's incarceration, uncertain future, limited relationship with the Children, and criminal and substance abuse history, we cannot say that the trial court's conclusion that the conditions resulting in the Children's removal or the reasons for placement outside the home will not be remedied is clearly erroneous. *See Castro*, 842 N.E.2d at 375 (concluding that the trial court did not commit clear error in finding conditions leading to child's removal from father would not be remedied where father, who had been incarcerated throughout CHINS and termination proceedings, was not expected to be released until after termination hearing).[4]

---

[4] To the extent Father argues that the court failed to afford sufficient weight to his recent improvements as contrasted with his historical patterns of conduct, we note that it is within the trial court's discretion to weigh a parent's prior history more heavily than efforts made by a parent prior to termination. *See In re E.M.*, 4 N.E.3d at 643.

## *Best Interests*

[23]     We next consider Father's assertion that DCS did not present clear and convincing evidence that termination is in the Children's best interest. He contends that the court failed to address the Children's "pain and suffering . . . when they realize that they will not have any further contact with [Father] or his family," and that they should be able to develop a relationship with him and their other siblings. Appellant's Brief at 10.

[24]     We are mindful that, in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. . . ." *Id.* at 648.

[25]     At the termination hearing, FCM Garza testified that termination is in the Children's best interest for many reasons, including Father's extensive criminal history, his long-time struggle with drug use, and the substantial portion of the Children's lives spent away from him. FCM Garza testified that the Children "are in need of some stability from an environment free of substance abuse to

survive." Transcript at 57. She explained that Father's lack of a relationship with the Children due to his incarceration and his post-incarceration plan of potentially living in the same household as his brother, who also has a history of drug use, raised concerns for the Children's long-term stability and best interests. She added that delaying permanency until Father is released is not in the Children's best interests. *Id.* at 61. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the court's determination that termination is in the Children's best interests is supported by clear and convincing evidence. *See In re E.M.*, 4 N.E.3d at 649 (holding that incarceration alone cannot justify "tolling" a child-welfare case and concluding that, because the trial court could reasonably have reached either conclusion, our deferential standard of review is dispositive and it was not clearly erroneous for the trial court to conclude that, after three and one-half years, the father's efforts simply came too late, and that the children needed permanency even more than they needed a final effort at family preservation).

## Conclusion

We conclude that the trial court's judgment terminating Father's parental rights is supported by clear and convincing evidence. We find no error and affirm.

Affirmed.

Baker, J., and May, J., concur.